## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JEFFERY WOOD, ROLANDO RUIZ, ROBERT JENNINGS, TERRY EDWARDS, AND RAMIRO GONZALES     Plaintiffs, | § § § § § § | CIVIL ACTION NO. _____ |
| vs. | § § § | DEATH PENALTY CASE |
| BRYAN COLLIER, Executive Director, Texas Department of Criminal Justice, | § § § § § | PLAINTIFF JEFFERY WOOD IS  SCHEDULED FOR EXECUTION ON AUGUST 24, 2016 |
| LORIE DAVIS, Director, Correctional Institutions Division, Texas Department of Criminal Justice, | § § § § § § | PLAINTIFF ROLANDO RUIZ IS SCHEDULED FOR EXECUTION ON AUGUST 31, 2016 |
| JAMES JONES, Senior Warden, Huntsville Unit Huntsville, Texas, | § § § § | |
| and | § § § | REMAINING PLAINTIFFS ARE SCHEDULED FOR EXECUTION IN SEPTEMBER, |
| UNKNOWN EXECUTIONERS;     Defendants. | § § | OCTOBER, AND NOVEMBER, 2016 |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs bring this action under 42 U.S.C. § 1983 for violations
and threatened violations of their rights under the First, Eighth, and
Fourteenth Amendments to the United States Constitution.   Upon

---

**PLAINTIFFS' ORIGINAL COMPLAINT**                                    Page 1 of 42

information and belief, Texas intends to execute Plaintiffs by injecting them with a lethal dose of compounded pentobarbital.  But Texas's use of compounded pentobarbital entails a substantial risk of causing Plaintiffs severe pain.   The risk of severe pain is not based on speculation—Oklahoma recently used compounded pentobarbital in the botched execution where the inmate's final words were "I feel my whole body burning."  In the current national landscape – where the supply of lethal injection drugs has effectively disappeared – there are increasingly grave concerns about the quality of the drugs Texas is using to carry out executions, and the increased risk that, as a result, condemned inmates will suffer excruciating pain at the time of their executions.

In addressing a similar challenge in *Whitaker v. Livingston*, No. H-13-2901, 2016 WL 3199532 (S.D. Tex. June 6, 2016), the Defendants (identical to those here) stipulated that they would "test the compounded pentobarbital for potency, sterility, and the presence of bacterial endotoxins shortly before it executes Perry Williams and Tomas Whitaker," the two named plaintiffs; the District Court relied on

that stipulation in dismissing the action.  *Id*. at *5-6.[1]  Plaintiffs here seek the same stipulation, and contend that a refusal to do so violates their right of equal protection under the laws guaranteed by the Fourteenth Amendment.

No Texas Court has ever permitted a condemned inmate to conduct meaningful discovery or proceed to trial to assess the constitutionality of Texas' lethal injection protocol, or the risks inherent to the protocol and the drugs used.  This stands in stark contrast to the thorough proceedings that have been permitted by federal courts all over the country – proceedings that vet the safeguards the Supreme Court deemed essential in *Glossip v. Gross*, 135 S. Ct. 2726 (2015).  Plaintiffs thus seek an injunction preventing Defendants from executing them under Texas' current lethal-injection protocol, ordering Defendants to conduct the testing that Defendants promised to perform in *Whitaker*, and ordering Defendants to provide all the information necessary to test Texas' protocol's constitutionality.  Plaintiffs further seek a full trial on the merits, with appropriate discovery and presentation of expert and lay testimony.

---

[1] Specifically, the State's promise to test the compounded pentobarbital "assuages concerns that an unreliable and untested drug will be used to kill Williams."  *Id*.

## NATURE OF ACTION

1.     This action is brought pursuant to 42 U.S.C. § 1983 for violations and threatened violations of Plaintiffs' rights under the First, Eighth and Fourteenth Amendments to the U.S. Constitution to be free from cruel and usual punishment, right to equal protection of the laws, right of access to the courts, right to counsel, and right to due process of law.  Plaintiffs seek injunctive relief.

## PLAINTIFFS

2.     Plaintiff Jeffery Wood is a person within the jurisdiction of the State of Texas.  He currently is a death-sentenced inmate under the supervision of the Texas Department of Criminal Justice ("TDCJ"), TDCJ #999256.  He is confined at the Polunsky Unit in Livingston, Texas.  His initial state and federal habeas appeals have been completed.  He is scheduled for execution on August 24, 2016.

3.     Plaintiff Rolando Ruiz is a person within the jurisdiction of the State of Texas.  He currently is a death-sentenced inmate under the supervision of the TDCJ, TDCJ #999145.   He is confined at the Polunsky Unit in Livingston Texas.  His initial state and federal habeas

appeals have been completed.  Mr. Ruiz is scheduled for execution on August 31, 2016.

4.     Plaintiff Robert Jennings is a person within the jurisdiction of the State of Texas.  He currently is a death-sentenced inmate under the supervision of the TDCJ, TDCJ #000956.  He is confined at the Polunsky Unit in Livingston Texas.  His initial state and federal habeas appeals have been completed.  Mr. Jennings is scheduled for execution on September 14, 2016.

5.     Plaintiff Terry Edwards is a person within the jurisdiction of the State of Texas.  He currently is a death-sentenced inmate under the supervision of the TDCJ, TDCJ #999463.  He is confined at the Polunsky Unit in Livingston Texas.  His initial state and federal habeas appeals have been completed.  Mr. Ruiz is scheduled for execution on October 19, 2016.

6.     Plaintiff Ramiro Gonzales is a person within the jurisdiction of the State of Texas.  He currently is a death-sentenced inmate under the supervision of the TDCJ, TDCJ #999513.  He is confined at the Polunsky Unit in Livingston Texas.  His initial state and federal habeas

appeals have been completed.  Mr. Ruiz is scheduled for execution on November 2, 2016.

7.     Plaintiffs are not challenging their convictions or sentences of death in this action.  They are challenging the manner and means by which Defendants will carry out their sentences of death.

## **DEFENDANTS**

8.     Defendant Bryan Collier is the Executive Director of the TDCJ.

9.     Defendant Lorie Davis is the Director of the Correctional Institutions Division of the TDCJ and holds the power, by statute, to determine and supervise the manner by which death sentenced inmates are executed.  Tex. Code Crim. Proc. art. 43.14.

10.     Defendant James Jones is the Senior Warden of the Huntsville Unit, where executions take place.

11.     Defendants Unknown Executioners are employed by the TDCJ and carry out executions in Texas.  Plaintiffs do not yet know their identities because the TDCJ conceals them.

12.    The Defendants are all state officials acting, in all respects relevant to this action, under color of state law.  They are all sued in their official capacities.

## JURISDICTION & VENUE

13.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201 (declaratory relief), and 2202 (further relief).  This action arises under the First, Eighth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. § 1983.

14.    Venue in this Court is proper under 28 U.S.C. § 1391, and this Court has personal jurisdiction over the defendants in this matter because the events giving rise to this claim – both executions and the procurement and maintenance of drugs used in the lethal injection process – occur in Huntsville, Texas.

## EXHAUSTION OF REMEDIES

15.    Plaintiffs need not exhaust administrative remedies under 42 U.S.C. § 1997(a) because they are not challenging their conditions of confinement, and because no administrative remedies exist that could address Plaintiffs claims.

---

# FACTUAL ALLEGATIONS

16.    Under Texas law, Defendants have the statutory authority and duty to establish and administer a lethal injection protocol.  The Texas Code of Criminal Procedure provides:

> Whenever the sentence of death is pronounced against a convict, the sentence shall be executed at any time after the hour of 6 p.m. on the day set for the execution, by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such convict is dead, such execution procedure to be determined and supervised by the director of the correctional institutions division of the Texas Department of Criminal Justice.

Tex. Code Crim. Proc. art. 43.14 (Vernon Supp. 2016). "No torture, or ill treatment, or unnecessary pain, shall be inflicted upon a prisoner to be executed under the sentence of the law." *Id*. art. 43.24.

17.    This statute requires the director of the Division to determine and supervise Texas's lethal-injection protocol.  *Id.*

18.    The statute does not require specific drugs, dosages, or drug combinations.  *Id.*

19.    The statute does not require a specific manner of intravenous access for the execution.  *Id.*

20.   The statute does not require any certification, training, license, experience, or demonstrated competence for those who participate in the execution.  *Id*.

21.   Instead, the statute leaves all these details to the director of the Division.  *Id*.

22.   In July 2012, then-Director Rick Thaler adopted and promulgated Texas's current lethal-injection protocol.  Ex. A, at 2.

23.   TDCJ's Director has the unilateral power to change the protocol at any moment.  Tex. Code Crim. Proc. art. 43.14.

24.   As detailed above and below, TDCJ's current Execution Protocol does not contain the safeguards necessary to protect plaintiffs from the risk of cruel and unusual punishment at the time of their executions.

**Compounded Pentobarbital**

25.   Texas' current lethal injection protocol calls for the use of a single dose of pentobarbital to carry out executions.  Pentobarbital is a barbiturate, and is classified by the Drug Enforcement Administration ("DEA") as a Schedule II controlled substance.  It has few authorized uses in humans – primarily (and rarely) used for anesthesia, and for the

euthanasia of animals.  It is especially risky in its compounded form, both because of the unregulated nature of the compounding industry, and because there is no scientific description of, or formula for, the process of compounding pentobarbital for use in executions.

26.   In September 2013 Texas began purchasing and using compounded – rather than manufactured – pentobarbital to carry out executions.  Upon information and belief, Texas continues only to use compounded pentobarbital to this day.

27.   Compounding is a practice by which a pharmacist combines, mixes, or alters ingredients in response to a prescription to create a medication tailored to the medical needs of an individual patient. Independent laboratories can test compounded drugs for a variety of measures, including identity, strength, and for contaminants.

28.   Commercial pharmaceutical products (i.e., manufactured pharmaceutical products) require compliance with a rigorous licensing process and are the result of substantial scientific research and development programs.

29.   Pharmaceutical compounded preparations (i.e., compounded preparations) have numerous exemptions from licensing process and

accordingly, do not require established scientific investigations ("proof") for specific formulations.

30.   Compounding pharmacies often lack the infrastructure needed to make sterile, potent, and safe injectable pentobarbital.

31.   FDA inspections routinely uncover compounding pharmacies that have not followed procedures designed to prevent drug contamination.

32.   The United States Pharmacopeial Convention ("USP") classifies pentobarbital as a high-risk sterile injectable.   *See* General Chapter <797>, Pharmaceutical Compounding – Sterile Preparations.[2]

33.   The integrity, potency, and sterility of compounded pentobarbital are affected by, among other things:  the quality of the active pharmaceutical ingredient ("API") used to make the drug; the quality of the compounder and the conditions of the laboratory in which the drug is compounded; the time between compounding and use; the conditions and manner of storage between compounding and use; the assigned beyond use date ("BUD") and the qualifications of and method used by the person assigning the same.

---

[2] The USP is the seminal scientific advisory publication concerning the compounding of sterile injectables.

34.    Compounded preparations are assigned a BUD to prevent degradation of a compound that the USP has calculated is likely to occur after a set time frame.  Absent extended sterility testing, USP <797> sets the BUD for high-risk compounded sterile preparations as follows:

- 24 hours, if stored at room temperature,
- 72 hours, if kept refrigerated, or
- 45 days, if kept in a solid, frozen state.

The use of compounded pentobarbital that has long surpassed its recommended BUD to conduct executions raises grave concerns about potency, sterility, and stability of the pentobarbital, and thus, of the risk of severe pain to the inmate.

**Defendants' Lethal Injection Drug Supply**

35.    Since September 2013, Defendants' supply of compounded pentobarbital has fluctuated.  Some vials have come and gone in strange increments.  Others have been returned or exchanged. Defendants never have explained these fluctuations.

36.    When asked for information about their supply of compounded pentobarbital, Defendants historically have engaged in delay tactics and have provided evasive answers.

---

**PLAINTIFFS' ORIGINAL COMPLAINT**                          **Page 12 of 42**

37.     When asked for information about the results from testing conducted on their supply of compounded pentobarbital, Defendants historically have provided only minimal and insufficient information.

38.     To date, the only information in Plaintiffs' possession concerning the drugs with which Defendants intend to carry out Plaintiffs' executions are those pertaining to Mr. Wood's scheduled execution, received in response to a Public Information Act request submitted by Mr. Wood.[3]   The information received included the following:

- The July 2012 Execution Protocol;[4]
- A redacted laboratory sheet reflecting potency testing conducted on "pentobarbital sodium" received April 6, 2016 (with a handwritten notation "use by date 10/31/16") and a redacted laboratory sheet reflecting potency and "microbiology" ("Scan RDI" and "Bacterial Endotoxins") testing conducted on "pentobarbital sodium" received on March 17, 2016 (with a handwritten notation "exp. 3/31/2017");
- The DEA Form 222 accompanying a purchase of 17 units of "pentobarbital 2.5g" on May 13, 2015, and a Form 222

---

[3] The only way Plaintiffs are able to obtain this information is through a Public Information Act request.  As Defendants' drug supply is constantly in flux, it is pointless to request information about the drugs to be used until shortly before a scheduled execution.  Plaintiff Ruiz's request is pending.  The remaining Plaintiffs have not yet submitted requests.  The documents supplied in response to Plaintiff Wood's request are similar to those received by other condemned inmates who have faced imminent execution.

[4] *See* Exhibit A.

---

**PLAINTIFFS' ORIGINAL COMPLAINT**                                        **Page 13 of 42**

accompanying a purchase of 18 units of "pentobarbital 50 mg/ml" on March 23, 2016;

▪ The Huntsville Unit Pentobarbital storage inventory reflecting inventory between May 13, 2015 and April 28, 2016; and

▪ A statement via email transmission from one Amy Lee, Legal Assistant II with the TDCJ, stating that "the expiration date for the pentobarbital to be administered to your client on August 24th is: 10/31/2016."[5]

39. There is no explanation why Defendants provide a laboratory sheet reflecting testing on drugs with an "expiration" date of "3/31/2017" when Defendants' agent's email stated that the drugs used in Mr. Wood's execution had an expiration date of 10/31/2016. There is no explanation for why the laboratory sheet reflecting the 10/31/16 "use by date" only reflects potency testing—not the purity testing that is reflected on the other laboratory sheet that appears to have no relevance to the drugs intended for use in Mr. Wood's execution. There also is no explanation for why a DEA Form 222 reflecting a purchase in May 13, 2015 was provided, when any drugs purchased at that time would be fifteen months past their compounding date. There is no explanation for why there was lab testing performed on April 6, 2016,

---

[5] These documents are attached as Exhibits B-1 (redacted laboratory sheets); B-2 (DEA form 222 sheets); B-3 (storage inventory); and B-4 (email), respectively.

when the inventory log does not reflect the addition of new drugs received on or shortly after that date.

40.    Thus, the use by date of one set of drugs in Defendants' possession appears to be approximately six months from the date of testing; the use by date of the second set of drugs in Defendants' possession appears to be approximately one year from the date of testing.  There is no explanation why the use by dates are six months and one year when the USP assigns a BUD for a maximum of 45 days (if kept in a solid, frozen state).

41.    According to information provided by Defendants regarding the current supply of compounded pentobarbital, as well as information previously provided regarding prior purchases, the drugs TDCJ uses to carry out executions are tested one time, shortly before delivery to TDCJ.

42.    The testing that Defendants have done is completed in two to three days.

43.    Upon information and belief, no additional testing is conducted before the drug is used in an execution.

44.    Upon information and belief, Defendants also have in their possession three other drugs commonly used to carry out executions: propofol, midazolam, and hydromorphone.

45.    Plaintiffs are not given access to the drugs intended for use in their executions for viewing or testing.

46.    Defendants have refused to disclose if each batch of drugs is compounded separately, or if a different API is used for each batch.

47.    Defendants have refused to disclose if the same compounder, compounding facility, or testing laboratory are used each time.

48.    Defendants have refused to provide information about the quality of and the conditions at the laboratory or laboratories where Defendants' pentobarbital was compounded.

49.    Defendants have refused to provide information about the qualifications of the individual(s) who compounded Defendants' supply of compounded pentobarbital.

50.    Defendants have refused to provide information about the qualifications of the personnel who purchase(d), store(d), and control(led) Defendants' supply of compounded pentobarbital.

51.    Defendants have refused to provide information about the qualifications of the personnel who inspect Defendants' supply of compounded pentobarbital before executions.

52.    Defendants have refused to provide information about the qualifications of the personnel who mix the lethal injection solution before executions.

53.    Information that has come to light or has been supplied by Defendants regarding the conditions under which the compounded pentobarbital  is transported or stored is inconsistent and incomplete.

54.    In August 2015, Texas gifted three vials of lethal injection drugs to Virginia for the execution of Alfred Prieto.  According to court records in *Prieto v. Clark*, No. 1:15-cv-01258 (E.D. Va.), Virginia prison officials testified they were told by Defendants' employees that the vials did not need to be refrigerated, were not refrigerated during the car ride back from Texas, and should be kept "on the counter".  On August 20, 2015, Defendants averred to the *Whitaker* court that all drugs are kept refrigerated at certain temperatures and transported in a temperature-controlled environment.  *See Whitaker*, Doc. 98.

**The Stipulation in *Whitaker v. Livingston***

55.   On October 21, 2015, in the matter of *Whitaker v. Livingston*, a § 1983 action challenging Texas' lethal injection practices, the court issued a request for clarification regarding Defendants' commitment "to re-testing the compounded pentobarbital for potency, sterility, and the presence of bacterial endotoxins shortly before it executes Perry Williams and Thomas Whitaker."   *See Whitaker v. Livingston*, No. H-13-2901 (S.D. Tex.), Doc. # 117.   On October 23, 2015, the defendants – identical to those named here – stated in response: "Defendants will re-test the drug shortly before its use in the executions of Perry Williams and Thomas Whitaker."   *Id.*, Doc. #118.

56.   The Order dismissing *Whitaker*[6] noted and relied upon the stipulations made by the defendants: Texas stipulated that it will "test the drug for reliability shortly before the executions of" Williams and Whitaker.   *Whitaker*, Civil Action H-13-2901, 2016 WL 3199532, at *5 (S.D. Tex. June 6, 2016).   The court noted in its order of dismissal that Texas' promise to test the compounded pentobarbital shortly before the

---

[6] The case now is on appeal.  *See Whitaker v. Livingston*, No. 16-20364 (CA5).

executions "assuages concerns that an unreliable and untested drug will be used to kill Williams and Whitaker." *Id.*

**Texas Voluntarily Withdraws Williams's July 14, 2016 Execution Date**

57.    On January 15, 2016, Mr. Williams was scheduled for execution on July 14, 2016.  *See Whitaker*, Doc. No. 123.

58.    On May 31, counsel for the *Whitaker* defendants emailed plaintiffs' counsel:

> The compounded pentobarbital allotted for Mr. Williams is being submitted for testing soon ('shortly before it executes Perry Williams') and it's estimated that results will be back around two weeks after the submission date.

*See Whitaker*, Doc. No.  130 , p. 2 and Ex. 2.

59.    Thus, although Defendants stipulated on October 23, 2015 that they would test the compounded pentobarbital for potency, sterility, and the presence of bacterial endotoxins shortly before Williams' scheduled execution, and on January 15, 2016 Mr. Williams was scheduled for execution on July 14, 2016, and on May 31 Defendants' counsel stated that the pentobarbital intended for use in Mr. Williams' execution would be submitted for testing soon, and the testing takes approximately two to three days, on July 6, 2016 Texas

voluntarily withdrew Mr. Williams's execution date because, purportedly, it did not have time to complete the promised testing. *See State v. Williams*, Cause No. 856243 (186th D.Ct., Harris County, Texas), *Order Withdrawing Execution Date* (July 6, 2016).[7]   Press accounts provide the only information of record regarding the purported reasons:

> Jason Clark, a spokesman for the Texas Department of Criminal Justice, said while the state has enough drugs to carry out all seven executions scheduled through October, Perry Eugene Williams' execution was delayed because the agency could not get the test results back in time. [ . . . ] Prison officials said the delay was ordered by a Houston court after they alerted it the test results could not be obtained on time.[8]

60.   Although the State has not revealed the reasons why it could not accomplish the testing in a timely manner or deliver the promised test results, its failure to do so raises concerns about the potency, sterility and efficacy of the State's inventory of compounded

---

[7] Plaintiff Ramiro Gonzales was previously scheduled for execution on August 10, 2016.  After Defendants caused Mr. Williams date to be withdrawn, Mr. Gonzales approached the convicting court judge, and, citing the cause for and the withdrawal of Mr. Williams date, asked for his execution date to be withdrawn or modified.  The state court granted that motion, and withdrew Mr. Gonzales' August 10, 2016 date.  He was subsequently scheduled for execution on November 2, 2016.  *See* Exhibit C.

[8] Mike Ward, *Drug Testing Delays Execution for Houston Killer*, Houston Chronicle, July 6, 2016, available here:  http://www.chron.com/news/politics/texas/article/Drug-testing-delay-execution-for-Houston-killer-8344549.php

---

pentobarbital, as well as Defendants' veracity and good faith on matters concerning lethal injection.

## Texas' Lethal Injection Protocol

61.   The protocol states that "[d]esignated staff on the Huntsville Unit are responsible for ensuring the purchase, storage, and control of all chemicals used in lethal injection executions for the State of Texas." Ex. A, at 8.

62.   The protocol does not require that the personnel responsible for purchasing, storing, and controlling Texas' lethal injection drugs have any training whatsoever, medical or otherwise, when it comes to purchasing, storing, and controlling lethal injection drugs.

63.   Although the protocol states that "[a]n inventory and equipment check shall be conducted," it is unknown what type of "check" is conducted or by whom.

64.   The protocol does not require that the personnel responsible for this check be qualified to recognize signs of contaminated, expired, or impotent drugs.

65.   The protocol states that "[t]he lethal injection drug shall be mixed and syringes shall be prepared by members of the drug team as

follows: Pentobarbital—100 milliliters of [normal saline] solution containing 5 grams of Pentobarbital." *Id.* at 8.

66.   The protocol does not require that this lethal injection solution be prepared by a person with medical training or any other qualifications. *See id.* at 7–8.

67.   The protocol requires the director and the warden of the Huntsville Unit (or their designees) to monitor the inmate after injection. *Id.* at 9.

68.   The protocol does not require that either the director or the warden (or their designees) have any medical training or other qualifications.

69.   The protocol does not require that either the director or the warden (or their designees) receive any training on what to look for while monitoring the inmate.

70.   Should Defendants inject plaintiffs with contaminated, expired, or impotent drugs, Texas' protocol does not contain sufficient safeguards to allow for immediate recognition and alleviation of the severe pain Plaintiffs would be experiencing.

71.    A lack of integrity, potency or sterility in the drugs used for execution raises a substantial risk that the person being executed will suffer excruciating pain at the time of execution, or that the execution will take so long as to constitute cruel and unusual punishment.

**Recent Developments Drawing Further Into Question the Quality and Viability of Defendants' Drug Supplies and Lethal Injection Protocol.**

72.    In October 2015, a news story revealed that Texas (and Arizona) was attempting to import large quantities of sodium thiopental from India – despite the fact that FDA has made clear that importation of sodium thiopental into the United States is illegal – and that in late July the attempted shipment had been detained in Houston by FDA.[9] Indeed, Defendant spokesperson Jason Clark stated that "yes, it [TDCJ] is seeking to import sodium thiopental after having obtained a license from the DEA to import drugs. Asked from whom Texas had ordered the

---

[9] Chris McDaniel and Chris Geidner, *Arizona, Texas Purchased Execution Drugs Illegally Overseas, But FDA Halts The Import*, BUZZFEED NEWS, Oct. 22, 2015, available here:  http://www.buzzfeed.com/chrismcdaniel/arizona-texas-purchased-execution-drugs-illegally#.rfgBRVw1l8; Tasneem Nashrulla, Chris Geidner and Chris McDaniel, *Three States Bought Illegal Execution Drugs from Supplier in India*, BUZZFEED NEWS, Oct. 23, 2015, available here: http://www.buzzfeed.com/tasneemnashrulla/three-states-bought-illegal-execution-drugs-from-supplier-in#.cu4O346Mqo; Chris Geidner and Chris McDaniel, *States Lawyer Up, Looking to Find a Way to Buy Execution Drugs from Overseas*, BUZZFEED NEWS, Oct. 25, 2015, available here: http://www.buzzfeed.com/chrisgeidner/states-lawyer-up-looking-to-find-a-way-to-buy-execution-drug#.vuM2Qay6DM.

---

drugs, he responded, 'That information is confidential under state law.'"[10]

73.    The news accounts detail that Defendants purchased the drugs from one Chris Harris, who not only has no pharmaceutical background, but registered his "facility" with the DEA using a small office space and his old apartment building, where he has not lived for years (and on which he owes back rent).[11]

74.    Until this information was revealed, Defendants had at no point indicated (despite being in the midst of the *Whitaker* litigation) that they were attempting to purchase sodium thiopental—and thus, *a fortiori*, considering a significant change in its execution protocol.

75.    These facts and disclosures bear directly on the reliability of Defendants' drug supply, and the very real chance that Defendants could change their lethal injection protocol at any time, without notice to Plaintiffs.

---

[10] *See* McDaniel and Geidner, *supra* n. 8.

[11] Chris McDaniel and Tasneem Nashrulla, *This is the Man in India Who is Selling States Illegally Imported Execution Drugs*, BUZZFEED NEWS, Oct. 20, 2015, available here: http://www.buzzfeed.com/chrismcdaniel/this-is-the-man-in-india-who-is-selling-states-illegally-imp#.va84ZbEA6n.

76.    These facts and disclosures bear directly on the lengths to which Defendants are willing to go to purchase drugs for use in executions—and their apparent lack of concern for the quality of the drugs purchased.[12]

77.    On May 13, 2016, the pharmaceutical company Pfizer, loathe for its products, intended for medicinal use, to be associated with executions, announced that it had "imposed sweeping controls on the distribution of its products to ensure that none are used in lethal injections."   Erik Eckholm, *Pfizer Blocks the Use of its Drugs in Executions*, New York Times, May 13, 2016.

78.    Upon information and belief, as drugs traditionally used to carry out executions become harder to obtain, Defendants have resorted to unorthodox (and illegal) methods to obtain drugs from sources that have not been vetted for quality, safety, purity, or stability.   As drugs become harder to obtain, and the quality becomes concomitantly suspect, adequate safeguards become increasingly crucial.

---

[12] *See also* Tana Ganeva, *The Sordid Ways Death Penalty States Obtain Execution Drugs*, Vice, August 2, 2016, available here:  http://www.vice.com/en_au/read/the-sordid-ways-death-penalty-states-obtain-execution-drugs.

---

## LEGAL CLAIMS

79.    Plaintiffs incorporate by reference each and every statement and allegation set forth throughout this Complaint as if fully set forth herein.

## COUNT 1

**Texas's lethal injection protocol violates the Eighth and Fourteenth Amendments because using compounded pentobarbital entails a substantial risk of causing severe pain that could be, but is not, mitigated by appropriate safeguards, and there are known, available alternatives.**

80.    Plaintiffs adopt by reference all preceding paragraphs.

81.    As a result of the facts set forth above and those enumerated herein, there is a substantial risk that Plaintiffs will suffer severe pain at the time of their executions.    That risk is "'substantial when compared to the known and available alternatives.'"  *Glossip v. Gross*, 576 U.S. __ (2015), slip op. at 13 (citing *Baze v. Rees*, 553 U.S. 35, 61 (2008)); *see also Louisiana ex. rel. Francis v. Resweber*, 329 U.S. 459 (1984); *Gregg v. Georgia*, 428 U.S. 153 (1976); *LaChance v. Erickson*, 522 U.S. 262 (1998); *Mullane v. Central Hanover Bank*, 339 U.S. 306 (1950). *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004).    "[S]ubjecting individuals to a risk of future harm—not simply actually inflicting

pain—can qualify as cruel and unusual punishment." *Baze*, 553 U.S. at 49.

## A.   Defendants' Failure to Conduct Sufficient Testing

82.   The drugs TDCJ uses to carry out executions are tested one time, shortly before delivery to TDCJ.  The time between delivery of the drugs and use in an execution ranges from three months to one year. Upon information and belief, no additional testing is conducted before the drug is used in an execution, which could be months, if not years, before the drug is used for an execution.

83.   The applicable literature and appropriate experts reflect that compounded drugs that are consumed beyond the use by date set out by USP <797> risk problems with sterility and potency that could cause excruciating pain at the time of injection for purposes of execution. TDCJ's use by date customarily has been six months to one year beyond that recommended by USP <797>.  The drugs Defendants have stated will be used to carry out the scheduled execution of Plaintiff Wood were tested once, almost five months prior to Mr. Wood's scheduled execution – and were given a use by date six months from the date of testing and the date the drugs were received by TDCJ.

84.   Injection of drugs that are impotent, contaminated, or impure would cause severe pain at the time of injection and during the course of an execution.  Contaminated pentobarbital would subject the inmate to the sensation, during the execution, that sandpaper was scraping the inside of his veins.  Use of impotent drugs would prolong the execution to a degree that it constitutes cruel and unusual punishment.

85.   The failure to conduct adequate testing, including testing close to the time of execution, the use of a laboratory that assigns a use by date months beyond professional standards, questionable storage conditions, questionable sources for the drugs and the API, suspicious practices in the purchase and return of the lethal injection drugs, among other things, individually and combined subject Plaintiffs to a substantial risk of suffering severe pain at the time of their executions.

**B.   Lack of Adequate and Readily-Available Safeguards**

86.   TDCJ's current protocol does not contain the safeguards necessary to protect Plaintiffs from the risk of cruel and unusual punishment at the time of their executions.  The safeguards important

to, but lacking in Texas' protocol (Ex. A) include, but are not limited to the following:

- Failure to require that the requisite "medically trained" individual that is part of the drug team (*see* Ex. A at Section IV.A.; *id.* at Section VII.C.) has currency in the practice of setting IV's or to have recently placed peripheral and/or central lines;

- Failure to require that the "designated staff on the Huntsville Unit . . . responsible for ensuring the purchase, storage and control of all chemicals used in lethal injection executions" (*see id.* at Section V.B.) have the scientific background, expertise or training necessary to ensure the purchase of quality drugs, or to know the requisite storage and control conditions necessary to ensure continued the drugs continued quality and efficacy;

- Failure to require that the "inventory and equipment check" and verification of "expiration dates" [sic] (*see id.*) is conducted by qualified individuals who are capable of recognizing indicators of subpar or otherwise problematic drugs or equipment;

- Failure to ensure that the person or persons responsible for "mix[ing]" [sic] (*see id.* at Section VI) the lethal injection drugs and preparing the syringes is medically and scientifically qualified to perform those functions;

- Failure to ensure that the "medically trained individual" is competent to recognize if the "rate of flow is interrupted" (*see id.* at Section VII.C.) and/or if the lethal injection drugs are being injected into the flesh rather than the veins;

- Failure to provide for access to counsel during the IV insertion process, and failure to provide provisions for counsel to observe the IV insertion process;

- Failure to ensure that, if IV access in a part of the body other than the arm is necessary, that appropriately trained individuals have visual access to the insertion point;

- Failure to require anything other than "visible signs of life" before a backup drug is administered;

- Failure to specify a medically specific and sound manner of determining death upon the completion of the administration of the lethal injection drugs;

- Failure to provide for access to counsel if constitutional violations arise during the course of an execution; and/or

- Established measures for how to proceed if an execution goes awry.

87.    Without sufficient safeguards in the execution protocol, also detailed above, TDCJ cannot determine whether an inmate is subjected to severe pain at the time of his execution.

88.    The existing method of execution, and the lethal injection drugs used to carry out same, precludes Defendants from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Glossip*, slip op. at 12 (citing *Baze*, 553 U.S. at 50).

89.    A known and available alternative to Texas' current execution method exists:  a single dose of an FDA-approved barbiturate, applied with appropriate safeguards and transparency that apply to

both the execution process and the manner in which the drugs are selected, purchased, stored, and tested (all relevant to a determination of the drugs' efficacy and purity – that is, the risk that it will cause substantial pain – at the time of the execution.)  Appropriate safeguards and transparency are essential to any alternative method of execution.

## COUNT 2

**Plaintiffs' rights under the First, Eighth and Fourteenth Amendments to not be subject to cruel and unusual punishment, to due process, notice, opportunity to be heard, and access to courts are violated by:  (1) Defendants' failure to disclose information regarding the lethal substance or substances TDCJ intends to use to carry out Texas executions; and (2) Defendants' concealment of information about how the executions will be carried out.**

90.     Plaintiffs adopt by reference all preceding paragraphs.

91.     Defendants refuse to provide information about the quality of and the conditions at the laboratory or laboratories where Defendants' supply of compounded pentobarbital was compounded.

92.     Defendants refuse to provide information about the qualifications of the pharmacist or pharmacists who compounded Defendants' supply of compounded pentobarbital.

93.    Defendants    refuse    to    provide    information    about    the
qualifications  of  the  personnel  who  purchase,  store,  and  control
Defendants' supply of compounded pentobarbital.

94.    Defendants    refuse    to    provide    information    about    the
qualifications  of  the  personnel  who  inspect  Defendants'  supply  of
compounded pentobarbital before executions.

95.    Defendants    refuse    to    provide    information    about    the
qualifications  of  the  personnel  who  mix  the  lethal  injection  solution
before executions.

96.    These pieces of information provide only an example—not an
exhaustive  list—of  the  kind  of  material  information  necessary  to
determine  whether  Defendants'  use  of  compounded  pentobarbital  to
execute Plaintiffs will comport with the Eighth Amendment.

97.    Defendants  refusal  to  provide  these  material  details
concerning  Texas's  lethal  injection  protocol  –  information  relevant  to
the  integrity,  purity,  stability  and  potency  of  the  drug  or  drugs  at  the
time  of  execution  –  violates  Plaintiffs'  right  under  the  Eighth
Amendment  to  not  be  subject  to  cruel  and  unusual  punishment,  and
their right to due process, notice, an opportunity to be heard, and access

to courts, in violation of the First, Eighth, and Fourteenth Amendments to the United States Constitution.

98.    TDCJ's failure to test the compounded pentobarbital shortly before Plaintiffs' executions or disclose information regarding the lethal substance or substances TDCJ intends to use to carry out Texas executions – information relevant to the integrity, purity, stability and potency of the drug or drugs at the time of execution – violates their right to not be subject to cruel and unusual punishment, and their right to due process, notice, an opportunity to be heard, and access to courts, in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

99.    Defendants' continued concealment of information, such as the method and means by which the compounding manufacturer prepares the drugs for executions, which would allow Plaintiffs the ability to ascertain, understand, and develop their potential claims, is further violation of due process, notice, an opportunity to be heard, and access to court.

100.  Due process demands that the State be enjoined from carrying out Plaintiffs' executions while it continues to refuse to disclose

in a timely and meaningful manner information critical to a determination of the constitutionality of its intended actions. Enjoining Plaintiffs' executions fully comports with precedent from the United States Supreme Court recognizing that due process does not permit the government to benefit from its suppression of information that might undermine the legality of its intended actions.

101. In criminal cases, for instance, "[i]f the Government refuses to provide state-secret information that the accused reasonably asserts is necessary to his defense, the prosecution must be dismissed." *Gen. Dynamics Corp. v. United States*, 131 S. Ct. 1900, 1905–06 (2011); s*ee also, e.g., Jencks v. United States*, 353 U.S. 657, 672 (1957) (holding that a "criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial"); *but cf. Roviearo v. United States*, 353 U.S. 53, 60–61 (1957) (holding that "[w]here disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or

is essential to a fair determination of a cause, the privilege must give way. In these situations, the trial court may require disclosure and, if the Government withholds the information, dismiss the action").

102.   Accordingly, the State should be enjoined from proceeding with Plaintiffs' executions until such time as it has timely revealed the information outlined above, and Plaintiffs have been provided a reasonable opportunity to be heard on the matters raised herein.

## COUNT 3

### Violation of Plaintiffs' right to Equal Protection under the law pursuant to the United States and Texas Constitutions.

103.   To establish a claim for relief under the Equal Protection Clause, a plaintiff must demonstrate that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis. *Harper* v. *Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966) ("[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.")

104.  In *Whitaker*, the same Defendants named herein stipulated that shortly before the executions of death row inmates Thomas Whitaker and Perry Williams they would test the drugs intended for use in their execution for potency, purity and sterility.

105.  Defendants' stipulation in *Whitaker* was deemed essential to the District Court's dismissal of plaintiffs' claims—that is, essential to addressing the constitutional challenges raised.

106.  The claims raised in *Whitaker* are similar to those raised herein.  The Plaintiffs to this action have the same grave concerns about the substantial risk that they will suffer intolerably at the time of their execution.  For purposes of these concerns, there is no meaningful distinction between the *Whitaker* plaintiffs and those named herein. There is no compelling reason for promising testing shortly before an execution to some condemned inmates and not others.

107.  Plaintiffs'  fundamental  right  under  the  Fourteenth Amendment to the U.S. Constitution to be free from cruel and unusual punishment is burdened when they do not receive the same protections as those in an identical situation, who were promised safeguards intended to address Eighth Amendment concerns.  *See Harper*, 383 U.S.

at 670; *see also In re Ohio Execution Protocol Litig.*, 671 F.3d 601, 602 (6th Cir. 2012) (denying Ohio's motion to vacate the district court's reasoning that "the State should do what it agreed to do:  in other words it should adhere to the execution protocol it adopted.") (internal citation omitted).

108.  A failure to perform the testing stipulated to in *Whitaker* burdens Plaintiffs' fundamental right to be free from cruel and unusual punishment, and thus Plaintiffs' right to equal protection.

109.  Even if Defendants were to promise that the consciousness assessment would be performed at every future execution, such a promise is insufficient to dispose of Plaintiffs' Equal Protection claim. "Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways." *United States* v. *Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (internal quotation omitted); *see also County of Los Angeles* v. *Davis*, 440 U.S. 625, 631 (1979).  ("[A]s a general rule, voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does

not make the case moot.") (internal quotation omitted). Furthermore, the protocol is not certain and could change at any moment.

110.   Nor can Plaintiffs' Equal Protection claim be resolved by this Court by simply ordering that Defendants perform testing "shortly before" each execution.   Specific parameters must be set down, in compliance with the relevant science:   the minimal amount of time before each execution during which the drugs must be tested; the type of tests conducted;   the minimal qualifications of the laboratory conducting the testing, and other relevant factors.

## COUNT 4:

**The absence of any requirement that Defendants notify Plaintiffs of any changes in the lethal substance to be used to carry out executions, or changes to their lethal injection protocol, deprives Plaintiffs of their ability to protect their right to not be subject to cruel and unusual punishment, and violates their right to due process, notice, an opportunity to be heard, and access to courts in violation of the Eighth and Fourteenth Amendments to the United States Constitution.**

111.   Under the Texas Code of Criminal Procedure, the TDCJ's Director has the unilateral power to change the existing Execution Protocol at any moment.   Tex. Code Crim. Proc. art. 43.14.   For example, although the TDCJ has represented that it currently uses compounded pentobarbital to carry out the executions, the Code does

not require it to give Plaintiffs any notice at all if the Director chooses to change the drug used to carry out Plaintiffs' executions.

112.  This lack of a notice requirement means that Plaintiffs will not have sufficient time to litigate whether their executions will be carried out lawfully by Defendants.  Without timely and meaningful notice, Plaintiffs will be unable to bring an effective legal challenge to any unlawful aspects of their proposed execution, which violates the Due Process Clause of the Fourteenth Amendment.

113.  Further, the fact that the TDCJ can change its execution protocol at any time prevents Plaintiffs from having meaningful access to courts because they cannot litigate the means of their execution if they do not know what the means will be.

114.  Finally, the fact that the TDCJ can change its execution protocol at any time deprives Plaintiffs of their ability to protect their right to not be subject to cruel and unusual punishment because they are prohibited from raising their claims in any court of competition, thus subjecting them to cruel and unusual punishment.

## **DEMANDS**

WHEREFORE, Plaintiffs ask this Court to:

A. Enjoin Defendants from executing Plaintiffs using compounded pentobarbital;

B. Order Defendants to provide appropriate safeguards to ensure Plaintiffs are not subjected to a substantial risk of excruciating pain, including:

a. the testing of the drugs intended for use in Plaintiffs' executions shortly before each execution;

b. the provision of the information necessary to implement and maintain those safeguards, including but not limited to full transparency about the process by which Defendants procure the lethal injection drugs, and the facts relevant to a valid scientific assessment of the quality of the drugs at the time of execution; and

C. A declaration that Defendants' actions violate Plaintiffs' First, Eighth and Fourteenth Amendment rights under the United States Constitution; and

D. Any other such relief as this Court deems just and proper.

Plaintiffs also request that this Court grant reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and the laws of the United States, as well as for costs of suit.

Dated:  August 12, 2016

Respectfully submitted,

KING & SPALDING, LLP

By:  */s/ Michael J. Biles*

Michael J. Biles
Attorney-in-Charge
State Bar No. 24008578
S.D. Tex. Fed. ID No. 23146
Jill R. Carvalho
State Bar No. 24087266
S.D. Tex. Fed. ID No. 2888436
KING & SPALDING LLP
401 Congress Ave. Suite 3200
Austin, Texas 78701
Tel: (512) 457-2000
Fax: (512) 457-2100
mbiles@kslaw.com
jcarvalho@kslaw.com

*Of Counsel:*

Maurie Levin
Attorney at Law
Texas Bar No. 00789452
614 South 4th Street #346
Philadelphia PA  19147
Tel: (512) 294-1540
Fax: (215) 733-9225
maurielevin@gmail.com

*Of Counsel:*

Abby L. Parsons
State Bar No. 24094303
S.D. Tex. Fed. ID No. 2618689
KING & SPALDING LLP
1100 Louisiana St., Suite 4000
Houston, TX 77002
Tel: (713) 751-3200
Fax: (713) 751-3290
aparsons@kslaw.com

**ATTORNEYS
FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of August 2016, the foregoing pleading was filed using the electronic case filing system of this Court. Thus, counsel of record for Defendants, who have consented to accept this Notice as service by electronic means, was served via the electronic filing system.

*/s/ Michael J. Biles*
Michael J. Biles